UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

GORDON LAWRIE, et al.,
individually and on behalf
of all others similarly situated,

      Plaintiffs,

v.                          CASE NO. 3:09-cv-446-J-32JBT

GINN DEVELOPMENT
COMPANY, LLC, et al.,

      Defendants.
_____/

## REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Defendants' Motions to Dismiss

("Motions") (Docs. 275, 276, 277, 278, 279) Plaintiffs' Third Amended Class Action

Complaint ("TAC") (Doc. 272) and Plaintiffs' Responses thereto (Docs. 280, 281,

282, 283).  On June 11, 2014, the Motions were referred to the undersigned for a

report and recommendation regarding an appropriate resolution thereof.  (Doc. 286.)

### I.    Summary of Recommendation

For the reasons set forth herein, the undersigned recommends that the

Motions be **GRANTED** and the TAC be **DISMISSED with prejudice** because the

---

[1] "Within 14 days after being served with a copy of [this Report and
Recommendation], a party may serve and file specific written objections to the proposed
findings and recommendations.  A party may respond to another party's objections within
14 days after being served with a copy."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. §
636(b)(1); M.D. Fla. R. 6.02(a).  "A judge of the court shall make a de novo determination
of those portions of the report or specified proposed findings or recommendations to which
objection is made."  28 U.S.C. § 636(b)(1).

TAC suffers from the same deficiencies as the First and Second Amended Complaints ("FAC" and "SAC," respectively).  (*See* Docs. 139, 259, 268.)  Further amendment would be futile.

First, as with the prior complaints, the TAC is an unwieldy, prolix, "shotgun pleading."  The Court noted these problems in dismissing both the FAC and the SAC.  (*See id.*)  However, Plaintiffs have still failed to cure them.  Therefore, the undersigned recommends that dismissal with prejudice is appropriate for Plaintiffs' repeated failure to cure these deficiencies.

Next, the undersigned recommends that Count I of the TAC, alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, be dismissed with prejudice because it is still premised on a fraud-on-the-market theory of reliance/causation/injury, which is not cognizable under RICO or applicable to the real estate market.  *See, e.g.*, *Se. Laborers Health & Welfare Fund v. Bayer Corp.*, 444 F. App'x 401, 405 (11th Cir. 2011) ("We have rejected the fraud on the market theory as being inappropriate in any context other than federal securities fraud litigation.")  Plaintiffs have not otherwise pled causation sufficiently to survive a motion to dismiss.

Additionally, Plaintiffs rely solely on an inflated purchase price theory of damages, which the Supreme Court has squarely rejected in the securities fraud context as inconsistent with "traditional elements of causation and loss."  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 & 346 (2005) ("[A]n inflated purchase

price will not itself constitute or proximately cause the relevant economic loss."). For example, there are no damages alleged aside from the difference between the allegedly inflated prices paid for the properties by Plaintiffs and the supposed actual market value of the properties at the time of purchase. The undersigned recommends that the principles of *Dura* apply here.

Similarly, the remaining counts should be dismissed with prejudice because each of them also contains a claim that requires causation and damages elements, which cannot be satisfied by a fraud-on-the-market or inflated purchase price theory. For these and other reasons, these counts should be dismissed as well.

Finally, the undersigned recommends that dismissal with, rather than without, prejudice is appropriate. Plaintiffs have had four opportunities to state a claim, two of which have come after the Court specifically informed them of deficiencies in the FAC and SAC. (*See* Docs. 139, 259, 268.) Rather than curing these deficiencies in the TAC, Plaintiffs have merely reasserted their inapplicable fraud-on-the-market theory in their longest and most unwieldy complaint yet. Because the TAC fails for the same reasons as the FAC and the SAC, the undersigned recommends that dismissal with prejudice is appropriate based on Plaintiffs' repeated failure to cure

deficiencies by amendments previously allowed, as well as futility of amendment.[2]

## II.    Summary of Allegations in the TAC

Preliminarily, the undersigned notes that, like the FAC, "[t]he sheer length and confusing structure of the [TAC] makes it difficult to parse."  (Doc. 139 at 8.)  This is a serious defect that has never been cured.  Therefore, the undersigned will address the TAC largely from a global perspective.  Plaintiffs allege that from approximately 2002 to 2006, the thirteen named Plaintiffs purchased properties in at least five residential communities[3] located in at least two different states (Florida and North Carolina), which were "developed by the Ginn and Lubert-Adler Defendants at prices that were fraudulently inflated."  (Doc. 272 at 1, 13, 18–40.)[4] The scheme allegedly "involved every step of the real estate purchase process," and included:

> (1) developing extravagant plans and promises for a series of Ginn/Lubert-Adler communities to be presented to potential purchasers in glossy literature, DVDs, at lavish

---

[2] Although Defendants' Motions raise a number of other arguments in support of dismissal, those arguments need not be addressed in light of the recommendation that the TAC be dismissed with prejudice for Plaintiffs' repeated failure to cure the unwieldiness of their complaint, or to adequately allege proximate cause and damages, which are case dispositive.

[3] These developments are:  (1) Tesoro and Tesoro Preserve in Port St. Lucie, Florida; (2) Reunion Resort in Orlando, Florida; (3) Bella Collina in Montverde, Florida; (4) The Conservatory at Hammock Beach in Palm Coast, Florida; and (5) Laurelmor in Boone, North Carolina (the "Named Developments").  (Doc. 272 at 13.)

[4] Because many of the paragraphs in the TAC are lengthy and span multiple pages, the undersigned will cite to page numbers rather than paragraphs therein.  Additionally, all page citations refer to the automatic page numbers generated by the CM/ECF system.

sales launches and through sales programs carefully coordinated by Ginn and Lubert-Adler across the developments; (2) developing the Ginn/Lubert-Adler communities to the extent necessary to give credence to representations that Defendants had the funding and commitment existed to complete the planned amenities, which had value that accompanies same; (3) aggressively pursuing purchasers with lies and misrepresentations and deceptive sales tactics; (4) setting the prices for each property at fixed non-negotiable prices purported to be the fair market value for the lots which were represented to be insufficient to meet demand; (5) selling the properties at far in excess of their fair market value and at fraudulently inflated values which were supported and substantiated by falsely recorded sales information and then reflected on pricing charts used by Ginn and Ginn salespersons in marketing properties to purchasers at the fixed, non-negotiable prices including [sic] in the price lists in standardized priority reservation selection event booklets at each priority reservation event ("sales launches"); (6) obtaining and relying on fraudulent appraisals with the intent to deceive; and (7) enlisting the participation of complicit lenders willing to knowingly provide and finance property sales for fraudulently inflated amounts which substantially exceeded the fair market value of each of the properties they financed.

(*Id.* at 1, 12–13.)[5]

The named Plaintiffs purport to bring this action "on their own behalf and . . . on behalf of a Class of all persons or entities that purchased real estate in Ginn developments, including but not limited to [the Named Developments]," apparently from 1998 through "the present date" (the alleged time frame for the fraudulent scheme), "or such time as will be established after a thorough review of Defendants'

---

[5] This portion of paragraph 21 of the TAC provides a good example of the confusing, wordy and conclusory way in which the 142 page TAC is pled throughout.

records." (*Id.* at 1, 105.)

Essentially, Plaintiffs describe Defendants' involvement in the alleged scheme as follows: Lubert-Adler, Fifth Third, SunTrust, and Wachovia provided the funding; RMA (an "unnamed co-conspirator") developed the marketing, using e-mails, websites, faxes, and targeted mailings; RMA, Ginn,[6] and Lubert-Adler conducted sham lotteries, "whisper campaigns," and lavish launches, at which they made misrepresentations about limited availability and high demand for the properties, as well as the amenities that would be built; the bank Defendants[7] invited the prospective purchasers to the launch events, identified the purchasers who had been pre-approved for financing, and used appraisals that they knew or should have known were false; and Ginn Title falsely recorded sales information, such as sales prices and sales dates, which was subsequently used as a basis for the allegedly fraudulent appraisals, which also improperly incorporated the value of leasebacks and furniture packages and used dissimilar properties for comparables without value adjustment. (*Id.* at 4–13, 40–105.) Plaintiffs also allege that Defendants' employees and executives, including Dean Adler (CEO of Lubert-Adler) and Bobby Ginn, purchased Ginn properties at discounted rates and "flipped them for substantial

---

[6] The TAC refers to "Ginn Development Company, LLC and its affiliates and subsidiaries" as "Ginn" and to Ginn Title Services, LLC and its predecessors-in-interest as "Ginn Title." (Doc. 272 at 5, 10.)

[7] The TAC identifies Fifth Third Bancorp, Fifth Third Bank (Michigan), SunTrust Mortgage, Inc., and Wachovia Bank, N.A. as the bank Defendants. (Doc. 272 at 2.)

profits to unsuspecting buyers at inflated prices." (*Id.* at 58–60.)

The TAC contains seven counts and alleges:  violations of 18 U.S.C. § 1962(c) of RICO as to all Defendants (Ginn/Lubert-Adler Enterprise) and, alternatively, as to Ginn, Lubert-Adler, Ginn Title and ESI (Alternative Enterprise), alleging that Defendants constitute an enterprise which conducted its affairs through a pattern of racketeering activity predicated upon acts of mail and wire fraud (Count I); violations of 18 U.S.C. § 1962(d) of RICO as to all Defendants, alleging that each Defendant conspired to violate section 1962(c) (Count II); civil conspiracy as to all Defendants (Count III); breach of fiduciary duty as to Fifth Third, Suntrust, and Wachovia (Count IV); and negligent supervision as to Fifth Third (Count V), SunTrust (Count VI), and Wachovia (Count VII).  Each Defendant has moved to dismiss pursuant to Fed. R. Civ. P. 8(a), 9(b), and/or 12(b)(6).

## III.    Applicable Standards

### A.    General Motion to Dismiss Standard

Under Rule 12(b)(6), the Court must determine whether the TAC sets forth sufficient factual allegations to establish a claim upon which relief can be granted. In evaluating whether Plaintiffs have stated a claim, the Court must determine whether the TAC satisfies Rule 8(a)(2).  In addition, where, as here, the complaint contains fraud-based claims, the TAC must also satisfy the heightened pleading requirements of Rule 9(b).

Rule 8(a)(2) requires that a pleading contain a "short and plain statement of

the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To satisfy this standard, a complaint must contain sufficient factual allegations to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Though detailed factual allegations are not required to satisfy this standard, Rule 8(a) demands "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* Indeed, allegations showing "[t]he mere possibility the defendant acted unlawfully [are] insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009); *see also Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'") (quoting *Twombly*, 550 U.S. at 557). Rather, the well-pled allegations must nudge the claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

In ruling on a motion to dismiss under Rule 12(b)(6), a court must construe the complaint in the light most favorable to the plaintiff and accept all well-pled factual allegations as true. *Sinaltrainal*, 578 F.3d at 1260. Although the Court must accept well-pled facts as true, it is not required to accept Plaintiffs' legal conclusions. *Iqbal*, 556 U.S. at 678 (noting "the tenet that a court must accept as true all of the

8

allegations contained in a complaint is inapplicable to legal conclusions"). In evaluating the sufficiency of a plaintiff's pleadings, a court is "not required to draw plaintiff's inference." *Sinaltrainal*, 578 F.3d at 1260 (internal citation and quotations omitted). "Similarly, unwarranted deductions of fact in a complaint are not admitted as true for the purpose of testing the sufficiency of plaintiff's allegations." *Id.* (internal citation and quotations omitted); *see also Iqbal*, 556 U.S. at 681 (stating conclusory allegations are "not entitled to be assumed true").

### B.    Fraud Pleading Standard

In addition to satisfying the Rule 8 requirements articulated by *Twombly* and *Iqbal*, a plaintiff alleging fraud must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).[8] This particularity requirement is required so as to "alert[ ] defendants to the precise misconduct with which they are charged and [to] protect[ ] defendants against spurious charges of immoral and fraudulent behavior." *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277 (11th Cir. 2006) (alterations in original, internal citation omitted). Thus, to satisfy Rule 9(b), a complaint alleging fraud-based claims must set forth the following with respect to each allegation of fraud:

(1) precisely what statements were made in what

---

[8] In accordance with Rule 9(b), "[w]hen a RICO claim is based on predicate acts involving fraud, those predicate acts must be pleaded with particularity[.]" *Liquidation Comm'n of Banco Intercontinental S.A. v. Renta*, 530 F.3d 1339, 1355 (11th Cir. 2008) (citing *Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316–17 (11th Cir. 2007)); *see also Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010).

> documents or oral representations or what omissions were made; (2) the time and place of each such statement and person responsible for making (or in, the case of omissions, not making) same; (3) the content of such statements and the manner in which they misled the plaintiffs; and (4) what the defendants obtained as a consequence of the fraud.

*Rogers v. Nacchio*, 241 F. App'x 602, 608 (11th Cir. 2007) (quoting *Ziemba v. Cascade Intern., Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)).

When a complaint alleges fraud-based claims against multiple defendants, Rule 9(b) requires specific allegations with respect to each defendant. *Ambrosia Coal*, 482 F.3d at 1317; *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997). These specific allegations "should inform each defendant of the nature of his alleged participation in the fraud." *Ambrosia Coal*, 482 F.3d at 1317 (affirming dismissal of a RICO complaint on Rule 9(b) grounds where complaint failed to allege "the nature of each defendant's participation in the scheme," failed to identify "each alleged statement, document, or misrepresentation made with the proper level of precision," and failed to specify "the content or manner in which the statements misled [the plaintiff]").

## C.    RICO Pleading Standard

To properly plead a RICO claim under section 1962(c), a plaintiff must plead facts supporting the following elements: "(1) conduct; (2) of [a RICO] enterprise; (3) through a pattern; (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). To support the pattern element, a plaintiff must plead facts

to support the following sub-elements: (1) the commission of two or more predicate acts of racketeering activity within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a continuing nature. *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir. 2004); 18 U.S.C. § 1961(5). "Racketeering activity" means the violation of any of the criminal statutes set forth in section 1961(1)(B), which include the statutes criminalizing mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).[9] The circumstances constituting fraud must be pled with particularity under Rule 9(b) as against each Defendant. *See Ambrosia Coal*, 482 F.3d at 1317.

In addition, in civil cases, "RICO plaintiffs must satisfy the requirements of 18 U.S.C. § 1964(c)," i.e., they "must show (1) the requisite injury to 'business or property,' and (2) that such injury was 'by reason of' the substantive RICO violation." *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282–83 (11th Cir. 2006) (per curiam).[10] "[C]ourts should scrutinize proximate causation at the pleading stage and

---

[9] "Mail fraud . . . occurs whenever a person, having devised or intending to devise any scheme or artifice to defraud, uses the mail for the purpose of executing such scheme or artifice or attempting so to do. The gravamen of the offense is the scheme to defraud, and any mailing that is incident to an essential part of the scheme satisfies the mailing element, even if the mailing itself contains no false information." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) (internal quotations and citations omitted). Similarly, wire fraud requires a showing of "(1) intentional participation in a scheme to defraud and (2) use of the interstate wires in furtherance of the scheme." *U.S. v. Hasson*, 333 F.3d 1264, 1270 (11th Cir. 2003).

[10] "The 'by reason of' requirement implicates two concepts: (1) a sufficiently direct injury so that a plaintiff has standing to sue; and (2) proximate cause." *Williams*, 465 F.3d at 1287. In the context of civil RICO claims these two concepts overlap. *Id.* at n.4.

carefully evaluate whether the injury pled was proximately caused by the claimed RICO violations." *Id.* at 1287 (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)).  Although plaintiffs are not required "to show that the injurious conduct is the sole cause of the injury asserted, . . . there must be 'some direct relation' between the injury alleged and the injurious conduct in order to show proximate cause." *Id.* at 1287–88 (citing *Anza*, 547 U.S. at 457).  "[I]t is enough for the plaintiff to plead and prove that the defendant's tortious or injurious conduct was a 'substantial factor in the sequence of responsible causation.'" *Id.* at 1288 n.5.

"[D]irectness of relationship . . . [is required] for a variety of reasons." *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 269 (1992).  "First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." *Id.*  "Second, . . . recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries." *Id*.  "[F]inally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Id.* at 269–70.

IV.    **Analysis**

A.    **The TAC is an Unwieldy, Prolix, "Shotgun Pleading"[11]**

The 142-page TAC, which begins with a single paragraph spanning two pages, does not reach the first of its seven counts until page 108.  Plaintiffs spend 22 of the first 107 pages making lengthy, conclusory, and confusing allegations as to reliance/causation/damages for each of the named Plaintiffs.  (*Id.* at 18–40.) Plaintiffs then spend the next 65 pages detailing the roles of each Defendant in the fraudulent scheme, including numerous scattershot examples of the alleged fraudulent conduct.  (*Id.* at 40–105.)[12]  Therefore, much like the FAC, the TAC again attempts to support conclusory allegations as to each Plaintiff and class member (*see, e.g.*, *id.* at 18–40, 105–140) with "factual enhancement" and "framework" as to each Defendant (*see, e.g.*, *id.* at 40–105) to "demonstrat[e] the plausibility of the claims alleged."  (*See* Doc. 139 at 12–13.)  As this Court previously noted in regard to the FAC: "The sheer length and confusing structure of the FAC makes it difficult to parse."  (*Id.* at 8.)  That observation remains applicable to the TAC.

However, as discussed in more detail below, the TAC again fails to meaningfully connect any specific fraudulent conduct to any specific damages

---

[11] Although not necessarily the primary reason for recommending dismissal with prejudice, the undersigned addresses the nature of the TAC first because it demonstrates why a global analysis of the TAC, rather than a specific analysis as to each plaintiff/defendant/claim, is necessary.

[12] Many of these examples are contained in lengthy single-spaced subparagraphs. (*See, e.g.*, Doc. 272 at 54–56.)

suffered by any specific Plaintiff.  Instead, it merely incorporates by reference at least 104 pages, or 255 paragraphs, of factual allegations into each of its seven counts. (*See id.* at 108, 126, 128, 131, 133, 135, 138.)  The FAC was dismissed largely for these same reasons.  (*See* Doc. 139 at 8–13.)  As the Court explained previously, although not a "quintessential shotgun pleading," the structure of the TAC renders it a shotgun pleading because "the counts themselves contain no facts; rather, the 'irrelevant factual allegations' through which this Court must sift are located within the [255]-plus paragraphs [or 104-plus pages] incorporated into each count." (Doc. 139 at 10 n.15.)[13]

Moreover, although dismissal of the SAC did not focus on these problems, primarily because the 68-page SAC was an improvement over the 135-page FAC, the Court noted that similar problems still existed in the SAC.  (*See* Doc. 259 at 4 n.7.)  Finally, the Court's suggestion that Plaintiffs plead more specific facts in dismissing the FAC and the SAC does not excuse the filing of another unwieldy, verbose pleading.  In fact, the Court specifically addressed this issue in its Order dismissing the FAC, stating "plaintiffs are reminded that Rule 9(b)'s particularity requirement does not mandate unwieldy, prolix complaints." (Doc. 139 at 12 n.18.) Thus, Plaintiffs have now repeatedly failed to cure the aforementioned deficiencies

---

[13] Furthering the confusion, none of Plaintiffs' seven counts incorporates the TAC's Introduction or Class Action Allegations.  (*See* Doc. 272 at 108, 126, 128, 131, 133, 135, 138 (failing to incorporate paragraphs 1 and 264–273).)  However, the class is mentioned in many of the counts, and the only plausible reading of the TAC as a whole is that all claims are being brought by Plaintiffs individually and on behalf of the class.

by previous amendments allowed.  Therefore, the undersigned recommends that, for this reason alone, dismissal of the TAC with prejudice is appropriate.

### B.    Plaintiffs' RICO Claim (Count I) Fails

### 1.    Plaintiffs Fail to Sufficiently Allege Causation

In dismissing the FAC, the Court noted its "concerns about the Plaintiffs' ability to satisfy RICO's proximate cause requirement," explaining that they "must do a better job of concisely identifying who did wrong, what specific actions they took that were wrong and how the Plaintiffs were proximately and adversely affected by these actions." (Doc. 139 at 17–19.)  Subsequently, the Court noted that "the SAC continues to suffer from many of the same deficiencies identified in the Court's September 21, 2010 Order . . . [including] a basic fatal defect because it is premised on a fraud-on-the-market theory of reliance/causation/injury." (Doc. 259 at 10.) The Court explained that "[b]ecause such a theory is not applicable to real estate markets, and is recognized only in federal securities cases, the undersigned recommends that the SAC be dismissed without prejudice." (*Id.*)  Despite the Court's explicit pleading instructions with regard to the FAC, and its clear rejection of Plaintiffs' legal theory advanced in the SAC, the TAC merely presents a more detailed version of the same fraud-on-the-market theory to support causation.

### i.    Fraud-on-the-Market Theory Defined

The fraud-on-the-market theory is "a presumption of reliance in the securities fraud context where the defendant disseminates a fraud to an efficient capital

market."  *Se. Laborers Health*, 444 F. App'x at 405.   "In that context, plaintiffs who purchased securities are permitted to demonstrate that they were damaged simply because defendant engaged in behavior otherwise prohibited and there was a change in price."  *Id.*

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations. . . . In this manner, evidence of a fraud disseminated to an open market creates a rebuttable presumption of reliance in the securities fraud context.

*Id.* (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 241–42 (1988)).   However, the presumption of reliance is not applicable in any other market, including the real estate market.  *See, e.g.*, *Appletree Square I, Ltd. v. W.R. Grace & Co.*, 29 F.3d 1283, 1287 (8th Cir. 1994) ("The real estate market, unlike the stock market, is not a well-developed market in which the price of a building reflects all publicly available information.")

### ii.   Summary of the Court's Conclusions Regarding the SAC's Fraud-on-the-Market Theory

In dismissing the SAC, the Court found that Plaintiffs necessarily relied on a fraud-on-the-market theory of reliance/causation/damages for primarily four

reasons.  First, the Court noted that the crux of Plaintiffs' case was that they all paid above-market prices for Ginn real estate because Defendants fraudulently inflated the value of all Ginn properties, i.e., "the entire market."  (*See* Doc. 259 at 13–14.) Next, the Court found that the extreme breadth of the SAC, including its class-action allegations, evidenced Plaintiffs' fraud-on-the-market theory, stating "[i]t is difficult to fathom how Plaintiffs could purport to bring this action on behalf of all purchasers of Ginn properties over an unspecified time period if they are *not* relying on a fraud-on-the-market theory."  (*Id.* at 14–15.)  Additionally, the Court noted the lack of specific allegations regarding Plaintiffs' reliance and causation of damages in concluding that the Plaintiffs must be relying on a fraud-on-the-market theory, which presumes such reliance.  (*Id.* at 15–16.)  Finally, the Court noted that the damages sought were only available in fraud-on-the-market cases.  (*Id.* at 16.)

As with the SAC, Plaintiffs continue to argue that they are not relying on a fraud-on-the-market theory to demonstrate causation or injury in the TAC (*see, e.g.*, Doc. 282 at 18).  *See In re Schering-Plough Corp.*, Case No. 2:06-cv-5774, 2009 WL 2043604, at *20 (D. N.J. July 10, 2009) ("Plaintiffs do not expressly plead a fraud on the market theory of RICO injury, presumably because such a theory has been

resoundingly rejected outside the context of federal securities fraud litigation.").[14]

However, as discussed below, the allegations in the TAC, although more detailed,

are essentially the same as those in the SAC.  Therefore, the TAC fails for the same

reasons as the SAC as to reliance and causation.

### iii.  The TAC Still Relies on a Market-Wide Price Inflation Theory

The TAC relies on the exact same premise as the SAC regarding inflation of

the entire market for Ginn properties.  Otherwise, there is no possible way the TAC

could be brought as a purported "Class Action Complaint."  (Doc. 272 at 1.)  For

example, the TAC alleges that all Plaintiffs, on behalf of themselves and the

purported class, "have suffered losses . . . because they were induced to pay far in

excess of the fair market value [of] properties at the time they purchased them as a

consequence [of the] fraudulent overpricing that resulted from the conduct" of

Defendants.   (Doc. 272 at 125–26.)   The TAC further alleges that absent

Defendants' conduct, as a result of which "the apparent value of Ginn/Lubert-Albert

properties was inflated . . . , Plaintiffs and Class members would have been advised

of and known the *fair market value* of the properties at the time they purchased them

and would not have paid, or agreed to pay, the *above-fair market value prices* that

---

[14] The district court in *In re Schering-Plough Corp.* also stated: "The gravamen of Plaintiffs' theory of injury is that they suffered economic loss where the price of the Subject Drugs increased as a result of misrepresentations made by [defendant] in the off-label promotion of [the drugs].  This is, by definition, a fraud-on-the-market theory and one which is not cognizable under RICO."  2009 WL 2043604, at *21–22.  This language is directly applicable here, with the simple substitution of real estate for drugs.

they were induced to pay or agree to pay as a result of the scheme." (*Id.* at 124–25) (emphasis added).  Thus, despite Plaintiffs' attempt to address individual purchases in the TAC, the only plausible reading of the TAC as a whole indicates that Plaintiffs' market-wide inflation theory remains the same.

### iv.   The Scope of the TAC has not Been Narrowed

Plaintiffs argue that they have significantly narrowed the scope of the TAC to address the Court's concerns regarding the breadth of the SAC.[15] (*See* Doc. 282 at 20.)   The undersigned disagrees.   The TAC names thirteen instead of sixteen Plaintiffs, and seven instead of nine Defendants. (Compare Doc. 141 at 1 with Doc. 272 at 1.)  Additionally, the TAC focuses on only five developments in two states rather than eleven developments in four states.  (Compare Doc. 141 at 13 with Doc. 272 at 13.)  Although in some respects the TAC may be slightly narrower than the SAC, it is still extremely broad.

Moreover, Plaintiffs maintain class action allegations in the TAC that are at least as broad as those presented in the SAC.  Specifically, the TAC defines the class as "*all persons or entities* that purchased real estate in Ginn developments, including *but not limited to*: [the Named Developments]."   (Doc. 272 at 105)

---

[15] It appears Plaintiffs are also attempting to eliminate factual distinctions between the TAC and the complaint in *Lester v. Percudani*, 556 F. Supp. 2d 473 (M.D. Pa. 2008), which the Court distinguished in its Order dismissing the SAC.  (*See* Doc. 282 at 20; Doc. 268 at 5–6.)    However, as explained below, *Lester* remains distinguishable.

(emphasis added).  Furthermore, there appears to be no time limitation defined for the class in the TAC, other than an allegation that the allegedly fraudulent scheme began in 1998.  (*See id.* at 1, 105–108.)  The TAC alleges that the class contains "thousands of members."  (*Id.* at 105.)  Therefore, it appears that the elimination of three named plaintiffs, two defendants, and six specific developments has no meaningful effect on the scope of the TAC, particularly in light of the class action allegations.[16]

Additionally, with regard to many of the named Plaintiffs, the TAC specifically provides that these Plaintiffs:

> also purchased properties in Ginn developments other than those addressed in the [TAC].  They *and the other Plaintiffs* expressly reserve the right to move to amend to *include additional properties* should they determine on the basis of discovery that the narrowing of the TAC to address the Court's concerns led to the inappropriate exclusion of such properties.

(*See, e.g.*, *id.* at 26 n.1) (emphasis added).  Thus, it appears that Plaintiffs may seek to broaden their claims in the future.  Accordingly, Plaintiffs have not narrowed the

---

[16] The Court previously expressed concern that "[i]t is difficult to fathom how Plaintiffs could purport to bring this action on behalf of all purchasers of Ginn properties over an unspecified time period if they are *not* relying on a fraud-on-the-market theory." (Doc. 259 at 14–15.)  Otherwise, it is obvious that this case is not maintainable as a class action.  *See, e.g.*, *Burstein v. First Penn-Pacific Life Ins. Co.*, 209 F.R.D. 674, 677 (S.D. Fla. 2002); *Gibbs Props. Corp. v. Cigna Corp.*, 196 F.R.D. 430, 440 (M.D. Fla 2000).

scope of the TAC from the SAC in any meaningful way.[17]

> **v.    The TAC Still Fails to Plausibly Allege Specific Reliance and Causation Even as to the Named Plaintiffs**

In more than doubling the length of the SAC, Plaintiffs attempt to allege specific reliance as to each named Plaintiff, as well as sufficient factual details in support thereof, to avoid dismissal.  As explained above, the TAC spends 22 pages, or 42 paragraphs, making confusing, conclusory allegations regarding each named Plaintiff's reliance on various actions taken by Defendants.  (Doc. 272 at 18–40.) The TAC then spends the next 65 pages, or 186 paragraphs, detailing "[t]he Defendants' roles in the fraudulent scheme." (*Id.* at 40–105.)  Although this section contains detailed factual allegations, the allegations are largely presented in the form of seemingly random examples which are not tied to any specific Plaintiffs, Plaintiffs' alleged reliance thereon, or Plaintiffs' alleged damages.  (*See id.*)   Instead of coherently alleging that specific Plaintiffs relied on specific fraudulent conduct by specific Defendants which resulted in specific damages, Plaintiffs essentially allege that misconduct "involved in every step of the real estate purchase process" (*see id.* at 1) tainted the entire market for Ginn properties, resulting in artificial inflation of the

---

[17] Additionally, the TAC adds a breach of fiduciary duty claim.   Plaintiffs presumably add this claim, which involves trust and confidence allegedly placed in employees of the bank Defendants, in an attempt to analogize this case with *Acciard v. Whitney*, Case No. 2:07-cv-476-UA-DNF, 2008 WL 5120898 (M.D. Fla. Dec. 4, 2008). However, as explained below, *Acciard* remains distinguishable.

market value of every piece of property purchased by Plaintiffs.[18]

First, most of what Plaintiffs' allege they specifically relied on amounts to nothing more than puffery, salesmanship, and future promises, not fraudulent conduct.[19]  To the extent that reliance on fraudulent conduct is alleged as to any specific Plaintiffs, the allegations are conclusory and not tied specifically to additional facts regarding specific Defendants which would render them plausible.   For example, named-Plaintiffs Stephen and Elizabeth Frieze allegedly relied, in part, on fraudulent appraisals by a named "complicit appraiser" who provided the "appraisal[s] necessary to execute the scheme." (*Id.* at 24–26.) However, nowhere in the "Inflated Appraisals" section of the TAC are these specific appraisals apparently even mentioned, much less detailed in a manner which would render plausible the allegations that they were fraudulent. (*See id.* at 96–105.)  Nor are they mentioned in non-conclusory terms in any other applicable section of the TAC.

---

[18] For example, the TAC merely gives multiple examples of alleged misconduct in the recording of sales, which in turn allegedly affected appraisals. (*Id.* at 49–51.) The TAC also gives multiple examples of alleged misconduct involved in the appraisals of certain properties, which in turn affected subsequent appraisals of other properties. (*Id.* at 54–57.) Thus, as the Court noted in dismissing the SAC, "it appears that any causal connection stems solely from the fact that Plaintiffs' purchases occurred after the allegedly fraudulent recordings.   Under this reasoning, essentially any purchaser who bought a property downstream from a Defendant's purported misrepresentation paid a fraudulently inflated price as a result of fraud."  (Doc. 268 at 5) (citations omitted).  The Court has already determined that this type of causal connection is too attenuated to support Plaintiffs' claims. (*See id.* at 5–7).

[19] For example, Plaintiffs largely relied on standard sales materials, presentations, and literature, plus three-dimensional models, DVDs, price lists, opinions of salespeople, etc.  (*See* Doc. 272 at 18–40.)

(*See, e.g.*, 54–57.)[20]  Thus, this type of alleged reliance on fraudulent appraisals by a named Plaintiff is entirely conclusory.

As an additional example, the TAC contains a lengthy critique, apparently by Plaintiffs' expert, of appraisals done by appraiser Bradley S. Long.  (Doc. 272 at 99–102.)  Although an appraisal at issue is tied to a property purchased by Plaintiff John Miller, the allegations regarding Mr. Miller's reliance thereon are indirect, attenuated, and lumped together with a host of other factors.  (*Id.* at 32–33.)  For example, apparently Mr. Miller did not rely on the appraisal itself, but allegedly on what others told him about an appraisal, presumably but not necessarily Mr. Long's appraisal, in addition to relying on statements that the property was a "good value," sales pitches and other factors.  (*Id.* at 33.)  Therefore, these allegations of causation regarding this appraisal are not plausible despite the great detail in the critique of the appraisal.[21]  Specifically, the allegations relating to Mr. Miller, found nearly 70 pages before the critique of the subject appraisal, are not pled with the particularity required for fraud claims, and his reliance is not sufficiently pled to survive causation scrutiny at the pleading stage in the RICO context.  (*See id.*)

These examples are indicative of the problem with allegations throughout the

---

[20] The undersigned notes that Plaintiffs' separate discussions of the same topic nearly 50 pages apart is indicative of Plaintiffs' manner of pleading throughout this action. This is more than simply a defect of form.  This type of pleading, whether intentional or not, is obfuscatory.

[21] The Court has warned Plaintiffs several times to avoid this type of unnecessarily detailed "factual enhancement."  (*See, e.g.*, Doc. 139 at 12–13.)

TAC.  The allegations as to the specific Plaintiffs are vague, conclusory and overly broad (*see, e.g.*, *id.* at 18–40), and the overly-detailed factual "examples" found much later in the TAC do not plausibly connect causation with each Plaintiff. Moreover, like both the FAC and the SAC, the TAC largely "follows its general allegations of the 'fraudulent scheme' with specific allegations that a particular defendant engaged in conduct which appears to be, at best, 'merely consistent with' that defendant's liability."[22]  (*See* Doc. 139 at 11–12; Doc. 268 at 7 n.3.)

Notably, Plaintiffs allege that "[r]egardless of the specific appraisal, recording, or other tactic which was used with regard to a particular [purchaser], each [purchaser] was harmed by Defendants' overarching scheme."  (Doc. 272 at 106.) Thus, it appears that Plaintiffs are relying on a theory that, because there was fraud "involved at every step of the real estate purchase process," every purchaser necessarily relied on some fraudulent conduct.  However, this is nothing more than a repackaged fraud-on-the-market theory.  *See Thompson's Gas & Elec. Serv. v. BP Am. Inc.*, 691 F. Supp. 2d 860 (N.D. Ill 2010) (holding that reliance on fraudulent conduct of a company cannot be presumed in an inefficient market (such as a real estate market) even when all information available regarding that market is false as a result of the company's fraudulent conduct).

---

[22] The undersigned recommends that the Court's detailed discussion of this problem with the FAC is equally applicable to the TAC and therefore incorporates that discussion by reference herein.  (*See* Doc. 139 at 10–13.)

vi.     **The TAC Alleges no Plausible Damages Other Than Fraud-on-the-Market Damages**

Additionally, based on Plaintiffs' characterization of their damages as a "fraud premium" constituting the amount each overpaid as a result of Defendants' alleged conduct that fraudulently inflated the purchase price of all Ginn properties, (*see, e.g.*, Doc. 282 at 22), the conclusion that Plaintiffs are relying on a fraud-on-the-market theory remains inescapable.  For example, the TAC does not allege what actually happened to the properties purchased by most Plaintiffs, or how much, if any, money most Plaintiffs actually lost.  *See In re Schering-Plough Corp.*, 2009 WL 2043604, at *21 ("While denominated as a premium price or price inflation theory of injury, it is abundantly clear that Plaintiffs' fourth theory of injury is actually a classic fraud-on-the-market theory normally pled in securities fraud cases, but one which is not cognizable under RICO.").

The TAC alleges a RICO claim no different than any other fraud-on-the-market claim.  It alleges that Defendants' conduct led plaintiffs to pay a higher price than they would otherwise pay absent the allegedly fraudulent conduct.  (Doc. 272 at 124–126.)  *See FindWhat Investor Grp. v. FindWhat.Com*, 658 F.3d 1282, 1311 (11th Cir. 2011) ("In a fraud-on-the-market case[,] . . . the plaintiff's claim is generally . . . that the initial investment transaction . . . would have occurred at a different price [in the absence of the alleged fraud.]"); *see also In re Schering-Plough Corp.*, 2009 WL 2043604, at *21 ("To plead injury under a fraud-on-the-market theory, a plaintiff

need only allege that the price of a drug 'was higher than it should have been as a result of defendant's fraudulent marketing campaign[.]'").[23]

Because "allowing a fraud on the market theory to satisfy the mandatory elements of ascertainable loss and causal nexus [in this case] would virtually eliminate the requirement that there be a connection between the misdeed complained of and the loss suffered," it has been rejected "in any context other than federal securities fraud litigation."  *See Se. Laborers Health*, 444 F. App'x at 405–406 (internal citations and quotations omitted).  Therefore, because the TAC relies on a fraud-on-the-market theory, the undersigned recommends that Plaintiffs' RICO claim be dismissed with prejudice. *See In re Schering-Plough Corp.*, 2009 WL 2043604 at *20, 22 (stating that a fraud-on-the-market "theory has been resoundingly rejected outside the context of federal securities fraud litigation" and it "is not cognizable under RICO").

### 2.   Plaintiffs Rely on an Inapplicable Inflated Purchase Price Theory of Damages

Separate and apart from Plaintiffs' reliance on a fraud-on-the-market theory of causation is their equally inapplicable reliance on an inflated purchase price theory of damages.  Plaintiffs argue that the amount of each Plaintiff's and class member's damages is the "delta between the value of the properties as determined

---

[23] Although Plaintiffs attempt to distinguish all fraud-on-the-market cases on their facts, the undersigned has reviewed the relevant cases cited by both sides and is unconvinced that those cases, which essentially dealt with an inflated price theory, are distinguishable.

by an appraisal using proper methodology and comparables and the non-negotiable, fixed price represented to be the fair market value at the time of sale." (Doc. 280 at 21.) Plaintiffs thus argue that this "fraud premium" is "measured at the time of purchase" and constitutes each purchaser's "out-of-pocket" damages. (Doc. 282 at 22–23.) Therefore, Plaintiffs contend that "[t]he decline in the real estate market after Plaintiffs' purchase[s] has no bearing on this case or the damages claimed."[24] (Doc. 283 at 21.)

### i.   Application of *Dura*

The Supreme Court squarely rejected Plaintiffs' theory of damages in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005). In *Dura*, the Court considered whether "plaintiffs need only 'establish' . . . that 'the price on the date of purchase was inflated because of the misrepresentation'" in order to allege loss causation in the securities context. *Id.* at 342. The Supreme Court held that "an inflated purchase price will not itself constitute or proximately cause the relevant

---

[24] Plaintiffs are clearly attempting to "avoid[] unworkable difficulties in ascertaining what amount of the plaintiff's injury was caused by the defendant's wrongful action as opposed to other external factors," as their "losses came in the wake of a downturn in the real estate market." *See First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 770 (2d Cir. 1994) (dismissing a real estate RICO claim for lack of causation following a downturn in the market). *See also Stein v. Paradigm Mirasol, LLC*, 586 F.3d 849, 852 (11th Cir. 2009) ("There was a sharp upward swing in housing prices between late 2000 and the end of 2005, and the resulting bubble was bigger in Florida than it was in most other states. . . . All bubbles eventually burst, as this one did.") Accordingly, with the exception of a few insufficient, conclusory allegations (*see, e.g.*, Doc. 272 at 21, 23, 28), the TAC is largely silent as to what actually happened to Plaintiffs' properties and how much money, if any, each Plaintiff actually lost on his or her investment(s).

economic loss." *Id.*[25]

Plaintiffs argue that it is not *Dura*, but *Gilchrist Timber Co. v. Rayonier, Inc.*, 472 F.3d 1329 (11th Cir. 2006) which controls for purposes of their "out-of-pocket" damages argument. (*See, e.g.*, Doc. 280 at 22.) However, *Gilchrist* dealt only with a narrow issue of prejudgment interest under Florida law. *See Gilchrist*, 472 F.3d at 1331. In doing so, it explained how the jury computed the relevant damages, but explicitly stated that "the *method* by which the jury was asked to calculate damages . . . [is] not before us now." (*Id.* at 1334) (emphasis added). Therefore, the Eleventh Circuit did not approve of Plaintiffs' theory of damages, particularly in a RICO context. The underlying claim in *Gilchrist* was made pursuant to Florida law and involved a single piece of property. Plaintiffs' RICO claim, involving the purchase of every piece of property in every Ginn development over an unspecified length of time, is clearly distinguishable. Therefore, *Gilchrist* does not control.

Plaintiffs also attempt to limit the holding in *Dura* to the securities context, arguing that "unlike a share of stock, real property is a tangible good with a measurable worth as established by standardized appraisal methodology." (Doc. 282 at 20.) Plaintiffs argue that retrospective appraisals of the properties at issue can determine the amount of damages incurred by Plaintiffs at the time the properties were purchased. (*Id.*) Therefore, Plaintiffs argue essentially that *Dura* is

---

[25] It is noteworthy that *Dura* was a unanimous opinion authored by Justice Breyer.

inapplicable because its holding is based on the unique nature of securities.

The undersigned rejects this argument and recommends that *Dura* is applicable to this case and does bar Plaintiffs' theory of damages.   First, the Eleventh Circuit has not rejected the application of *Dura* in a RICO context.   The undersigned is aware of the non-binding, unpublished opinion of *Lopez v. RICA Foods, Inc.*, 277 F. App'x 931 (11th Cir. 2008).   However, *Lopez* is distinguishable because it did not involve a RICO claim, but only securities claims (to which it applied *Dura*), and fraud claims under Florida law (to which it did not apply *Dura*). In a RICO context, *Dura* appears to be consistent with the Eleventh Circuit's directive to scrutinize causation at the pleading stage, *see Williams*, 465 F.3d at 1282–83, and with that court's rejection of a theoretical approach to damages in such cases, *see Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 709 (11th Cir. 2014) (affirming dismissal of a class-action RICO complaint where the plaintiffs "pled injury at only the highest order of abstraction and with only conclusory assertions"). Moreover, *Dura* makes clear that it does not create a special new rule for securities litigation, but merely applies well-established common-law fraud and causation principles in the securities context.   Specifically, the *Dura* Court explained in detail the "common-law roots of the securities fraud action," and that such claims require that plaintiffs "adequately allege and prove the *traditional elements of causation and loss*."  *Dura*, 544 U.S. at 344–46 (emphasis added).

Moreover, *Dura* discussed the practical problems with allowing an inflated

purchase price theory of damages, opining that "the logical link between the inflated

. . . purchase price and any later economic loss is not invariably strong" because

many things can affect the value of an investment. *Id.* at 342–43. Additionally, the

court noted its concern that allowing this theory of damages would "provide investors

with broad insurance against market losses." *Id.* at 345.[26] Therefore, although *Dura*

specifically dealt with securities litigation, for all of the aforementioned reasons, the

undersigned recommends that its rationale is equally applicable to the instant case.

### 3.    *Lester* and *Acciard* Remain Distinguishable

Plaintiffs rely on *Lester v. Percudani*, 556 F. Supp. 2d 473 (M.D. Pa. 2008),

and *Acciard v. Whitney*, Case No. 2:07-cv-476-UA-DNF, 2008 WL 5120898 (M.D.

Fla. Dec. 4, 2008), for the proposition that the RICO claim in the TAC should not be

dismissed because the RICO claims in those cases survived motions to dismiss

under facts similar to those presented in the TAC.[27] (*See, e.g.*, Doc. 282 at 20–22.)

However, not only are *Lester* and *Acciard* both non-binding district court opinions,

they are each distinguishable. The Court already distinguished *Lester* in its Order

dismissing the SAC, explaining that the SAC lacked the causation and detail present

---

[26] This theory also protects investors from simply making a bad deal by paying above "fair market value" for a piece of property as a result of many potential factors other than fraud.

[27] Plaintiffs actually cite *Lester v. Percudani*, 2008 WL 4722749 (M.D. Pa. Oct. 24, 2008) in their Responses. However, that opinion incorporates the detailed facts from the published decision, *Lester*, 556 F. Supp. 2d. at 473. Therefore, the undersigned will address the published decision.

in *Lester*, and that *Lester* dealt with far fewer purchasers, properties, and geographic locations.  (Doc. 268 at 5–7.)

Plaintiffs argue that *Lester* is no longer distinguishable because "the TAC now addresses a limited number of developments, with many repeat sales occuring in two of them."  (Doc. 282 at 21.)  However, as previously discussed, the TAC presents class allegations that relate to purchases of all Ginn properties over an unspecified period of time.  Moreover, Plaintiffs have specifically reserved the right to amend their allegations to include additional properties not addressed in the TAC.  Therefore, Plaintiffs have not meaningfully narrowed the TAC at all.  Furthermore, as discussed throughout this Report and Recommendation, the TAC still fails the causation requirement despite the additional facts pled by Plaintiffs.  Therefore, *Lester* remains distinguishable.

The undersigned finds *Acciard* distinguishable as well.  *Acciard* involved a RICO claim brought by real estate students against their "professors."  *See Acciard*, 2008 WL 5120898, at *1–4.  The students alleged that their "professors" engaged in a scheme wherein they would teach the students about good investment opportunities, present such "opportunities" to them, and then fraudulently induce the students to purchase properties in excess of their fair market value.  *Id.*

*Acciard* is distinguishable in at lease one respect because Plaintiffs here have not plausibly alleged that any specific relationships of trust led to their purchases of properties.  Plaintiffs attempt to allege, in a conclusory manner without any factual

support, that they placed trust in employees of the bank Defendants and therefore relied on their representations in purchasing the properties.  (*See* Doc. 272 at 18–40.)  Not only are these allegations conclusory, they are also different from the trust relationships alleged in *Acciard*.  A student trusting his or her own teacher to give advice in the subject area of a course is distinguishable from a real estate investor trusting a banker seeking to maximize profits on mortgage loans.  In short, Plaintiffs' addition of a breach of fiduciary duty claim as to the bank Defendants does not bring this case withing the purview of *Acciard*.  Therefore, both cases remain distinguishable, and the undersigned recommends that the RICO claim (Count I) be dismissed with prejudice.[28]

## C.    The Remaining Counts (Counts II–VII) in the TAC Fail

In light of the above conclusion as to Count I, the remaining counts (Counts II through VII) in the TAC also fail because they are each unwieldy and premised on a fraud-on-the-market theory, as well as an inflated purchase price theory, which are not recognized in this context or for these claims.

In addition, regarding Count II, it is well settled that plaintiffs cannot proceed on a RICO conspiracy claim under section 1962(d),[29] when they have not adequately

---

[28] The additional cases cited by Plaintiff in this regard are also distinguishable because they do not involve RICO claims.  Therefore, the causation scrutiny required in RICO cases did not apply in those cases.

[29] "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  18 U.S.C. § 1962(d).

alleged a substantive RICO violation. *See Rogers*, 241 F. App'x at 609 ("Thus, where a plaintiff fails to state a RICO claim and the conspiracy count does not contain additional allegations, the conspiracy claim necessarily fails."); *Super Vision Intern., Inc. v. Mega Intern. Commercial Bank Co.*, 534 F. Supp. 2d 1326, 1342 (S.D. Fla. 2008) ("Because [the court] concluded that Plaintiff had failed to state a claim for civil RICO under § 1962(c) or § 1962(a), [Plaintiff's] RICO conspiracy claim necessarily fails.").

Count III, alleging civil conspiracy under Florida law, also contains causation and damages requirements, which cannot be satisfied by a fraud-on-the-market theory or an inflated purchase price theory. *See Raimi v. Furlong*, 702 So. 2d 1273 (Fla. Dist. Ct. App. 1997) ("A civil conspiracy requires: (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) *damage to plaintiff as a result of the acts done under the conspiracy*." (emphasis added)).

Count IV, alleging breach of fiduciary duty under Florida law against the bank Defendants, also contains causation and damages elements. *See Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325 (11th Cir. 2012) ("The elements of a cause of action for breach of fiduciary duty in Florida include *damages flowing from the breach*." (quotations omitted) (emphasis added)). Again, this element cannot be satisfied using a fraud-on-the-market or inflated purchase price theory.

Finally, Counts V, VI, and VII, alleging negligent supervision against the bank

Defendants, should also be dismissed with prejudice because the underlying claim on which they are premised—civil conspiracy—fails as stated herein.  Moreover, similar to Counts I–IV, the negligent supervision counts have causation and damage elements, which cannot be satisfied by a fraud-on-the-market or an inflated purchase price theory.  *See Geidel v. Bradenton Beach*, 56 F. Supp. 2d 1359, 1366 (M.D. Fla. 1999) ("In order for Plaintiffs to sustain [a negligent and inadequate supervision count] which [is] predicated on negligence, they must establish: (1) existence of a duty on the part of the defendant to protect the plaintiff from the injury or damage of which he complains; (2) failure of the defendant to perform that duty; and (3) *injury or damage* to the plaintiff *proximately caused* by such failure." (emphasis added) (quotations and citation omitted)).  Therefore, the undersigned recommends that all counts in the TAC be dismissed with prejudice.

## D.   Dismissal of the TAC Should be With Prejudice

Plaintiffs request leave to amend the TAC in the event the Court dismisses any of the claims.  (Doc. 283 at 29.)  Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that "[t]he court should freely give leave [to amend pleadings] when justice so requires."  The Supreme Court has stated that "this mandate is to be heeded."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  The Supreme Court further stated:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, *repeated failure to cure deficiencies by*

>*amendments previously allowed*, undue prejudice to the
>opposing party by virtue of allowance of the amendment,
>*futility of amendment*, etc.—the leave sought should, as
>the rules require, be "freely given."  Of course, the grant or
>denial of an opportunity to amend is within the discretion
>of the District Court, but outright refusal to grant the leave
>without any justifying reason appearing for the denial is not
>an exercise of discretion; it is merely abuse of that
>discretion and inconsistent with the spirit of the Federal
>Rules.

*Id.* (emphasis added).

Even under the above strict standard, the undersigned recommends that the

TAC be dismissed with prejudice because of Plaintiffs' "repeated failure to cure

deficiencies by amendments previously allowed," as well as the "futility of

amendment."  Plaintiffs have filed a total of four complaints, two of which came after

they were given explicit guidance by the Court as to the deficiencies in the FAC and

the SAC.  (*See* Docs. 139, 259, 268.)  The TAC continues to be extremely unwieldy,

and continues to rely on a fraud-on-the-market theory after the Court went to great

lengths to point out these deficiencies in the FAC and the SAC.  (*See id.*)  Moreover,

the TAC contains nearly identical class allegations as the SAC, about which the

Court expressed great concern.   (Doc. 259 at 14–15.)   Additionally, the TAC

continues to rely on an inflated purchase price theory even though the Eleventh

Circuit has not recognized this theory in a RICO context.[30]   As a whole, this

constitutes a repeated failure to cure deficiencies by previous amendments allowed,

---

[30] While not previously addressed at length, the Court has noted the likelihood of the application of *Dura* to Plaintiffs' theory of damages.  (Doc. 259 at 17 n.21.)

which warrants dismissal with prejudice.

Moreover, for the reasons discussed throughout this Report and Recommendation, amendment by Plaintiffs at this point would be futile.  Specifically, the problems with the TAC are not curable because Plaintiffs simply cannot plausibly tie specific fraud by each Defendant to causation of specific damages to each Plaintiff.  In addition, it appears at this point that Plaintiffs are intent on bringing this action as a class action.[31]    Plaintiffs cannot even sufficiently allege reliance/causation/damages as to the thirteen named Plaintiffs, much less a class, because Plaintiffs' basic legal theories regarding causation and damages are flawed in this context.  Therefore, amendment would be futile.

Finally, in dismissing the SAC, the Court stated unequivocally that "failure to state a viable claim in the third amended complaint will result in dismissal with prejudice."  (Doc. 268 at 7.)  Therefore, the undersigned recommends dismissal of the TAC with prejudice.

## **RECOMMENDATION**

Accordingly, it is respectfully **RECOMMENDED** that:

The Motions (**Docs. 275, 276, 277, 278, 279**) be **GRANTED** and Plaintiffs' TAC (**Doc. 272**) be **DISMISSED with prejudice**.

---

[31] Even if Plaintiffs were to abandon their class allegations, for all of the reasons discussed herein, including the TAC's prolixity and inapplicable theories of causation and damages, the undersigned would still recommend dismissal with prejudice.

**DONE AND ENTERED** at Jacksonville, Florida, on July 15, 2014.

JOEL B. TOOMEY
United States Magistrate Judge

Copies to:

The Honorable Timothy J. Corrigan
United States District Judge

Counsel of Record

37